# EXHIBIT E

THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

PATRICIA HIVES, individually and )
as co-successor in interest to   )
Decedent Jacorey Calhoun,        )
                                 )
          Plaintiff,             )
                                 )
          v.                     ) CASE NO.:
                                 ) 4:15-cv-02490-DMR
COUNTY OF ALAMEDA, a municipal   )
corporation; DEREK THOMS,        )
individually and in his official )
capacity as deputy for the       )
COUNTY OF ALAMEDA, et al.        )
                                 )
          Defendants.            )
_____)
                                 )
M.C., by and through his guardian)
ad litem, ARION GUILLORY,        )
                                 )
          Plaintiff,             )
                                 )
          v.                     )
                                 )
COUNTY OF ALAMEDA, a municipal   )
corporation; DEREK THOMS,        )
individually and in his official )
capacity as deputy for the       )
COUNTY OF ALAMEDA, et al.,       )
                                 ) CERTIFIED COPY
          Defendants.            )
_____)


DEPOSITION OF DEPUTY DEREK THOMS

TUESDAY, MAY 3, 2016


REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

1

**DEPOSITION OF DEPUTY DEREK THOMS**

1       A.   I do.   There was eleven.

2       Q.   And that was ten years ago?

3       A.   I graduated the academy in January 2005.

4       Q.   January 2005?

5       A.   Correct.

6       Q.   That was 28 weeks?

7       A.   Correct.

8       Q.   Okay.

9       A.   I started in July 2004.

10      Q.   Thank you for doing the math.   I appreciate

11   that.

12           Was that your first time being in an academy?

13      A.   Yes, it was.

14      Q.   Did you have any particular reason as to why

15   you wanted to be an officer?

16      A.   My brother was a police officer at the time.

17   He no longer is, he's retired.   But I would say that's

18   probably the main reason.

19      Q.   Your sister, Kristen, older and younger?

20      A.   Younger.   Started after me.

21      Q.   Your brother, what's his name?

22      A.   Same as my dad's, Arthur.

23      Q.   Is he a Junior?

24      A.   He's a Third.

25      Q.   He's a Third.

                                                        22

DEPOSITION OF DEPUTY DEREK THOMS

1      A.   Police Officer Standard Training.

2      Q.   What does that mean to you, what is the Police

3 Officer Standard of Training?

4      A.   They have a standard they want to meet.  And

5 in order to meet those certain standards -- you have to

6 meet those certain standards before you can graduate

7 the academy, depending on what area you're talking

8 about the standards are different but --

9      Q.   Do you have an understanding of -- that any

10 person who seeks to be a law enforcement officer in the

11 state of California has to graduate from a POST

12 certified academy --

13      A.   Correct.

14      Q.   -- before you can begin practice as an officer

15 in the state of California?

16      A.   What do you mean practice, as --

17      Q.   Enlistment or patrol as an officer.

18      A.   Yes.

19      Q.   You have to graduate --

20      A.   Yes.  Before you can be a police officer with

21 a badge working on the streets or in the jails you have

22 to graduate from a certified POST academy.

23      Q.   That's the POST basic, right?

24      A.   Correct.

25      Q.   I would imagine you would have achieved at

24

**DEPOSITION OF DEPUTY DEREK THOMS**

1  least intermediate by now, is that right, the

2  certificate?

3       A.   I believe I have my advanced.

4       Q.   So that would be true then, yes, you have your

5  intermediate certificate as well?

6       A.   Yes.

7       Q.   But you now also have the advanced?

8       A.   I believe so, yes.

9       Q.   Okay.  Did you apply for it, to get your

10  advanced certificate?

11       A.   Yes.

12       Q.   Does it increase your pay for you have an

13  advance certificate?

14       A.   A little bit, yes.

15       Q.   Makes it pretty important for you to sign up

16  for it; is that right?

17       A.   Yes.

18       Q.   Okay.  As I understand it, POST is divided up

19  into several learning domains.  Is that how you recall?

20       A.   Correct.

21       Q.   You recall in the academy being tested on

22  different subject matter as to police practices?

23       A.   Yes.

24       Q.   Do you recall learning about specific subject

25  matter such as the use of force?

25

1     A.   I do.

2     Q.   Learning domain 20, as I recall it?

3     A.   I don't remember the domain.  But, yes, I

4  remember use of force.

5     Q.   Do you recall being tested or -- I'll ask you

6  this:  Do you recall being taught from the laws of

7  arrest?

8     A.   Yes.

9     Q.   Learning domain 15, as I recall; is that

10  right?

11     A.   I don't recall the number, but yes.

12     Q.   Okay.  Do you recall there being about 42

13  different learning domains?

14     A.   Yes, that sounds about right.

15     Q.   Do you recall being tested on each of those

16  individually?

17     A.   I remember being tested, yes.

18     Q.   And you had to pass all those tests; is that

19  right?

20     A.   Correct.

21     Q.   In order be certified and trained in POST

22  basic understanding of law enforcement practice; is

23  that right?

24     A.   Correct.

25     Q.   And so on, to get your intermediate

26

1    certificate and your advanced certificate; is that

2    right?

3        A.    Correct.

4        Q.    Do you have a college degree?

5        A.    I do not.

6        Q.    I understand that sometimes if you have a

7    degree that might help expedite you getting your

8    advanced or intermediate certificate; is that your

9    understanding as well?

10       A.    It would.

11       Q.    Okay.  All right.

12            So you started in February of '05?

13       A.    No.  I actually went through the academy as a

14   non-affiliate, which means I paid my own way through

15   the academy.  And, from there, I went and applied to

16   the different departments and I got hired by the

17   Alameda County Sheriff's on 3/13/2006.

18       Q.    Do you remember where else you applied?

19       A.    I applied for Albany.

20       Q.    Is that the police department?

21       A.    Correct.  Richmond PD.  Yeah.  And I think

22   Alameda PD.  And then, of course, the Sheriff's Office.

23       Q.    Did you get a job offer from those other

24   police departments?

25       A.    I did not.

27

**DEPOSITION OF DEPUTY DEREK THOMS**

1    A.   No.  But I think it only took me three months

2    to get hired with them.  So in December some time,

3    maybe.  I don't recall, though.  I'm estimating.

4    Q.   All right.  When did you become a dog -- a

5    trainer?

6    A.   I'm not a dog trainer.

7    Q.   I'm sorry.  Not a trainer, a handler.

8    A.   August 2010.  Right around there.  That is

9    when I was hired as a handler.

10        And our -- when we actually went on patrol,

11   after all the training and everything, it was about the

12   beginning of October 2010.

13   Q.   Had you had any training before those two

14   months of training?

15   A.   For canine?

16   Q.   Yeah.

17   A.   No.

18   Q.   So you had to apply to be a dog handler,

19   obviously; is that right?

20   A.   Correct.

21   Q.   Do you recall what the application process was

22   like?

23   A.   Yes.

24   Q.   Tell me about it.

25   A.   First you submit -- well, you have to wait

29

DEPOSITION OF DEPUTY DEREK THOMS

```
 1    before she became a member of the Alameda County

 2    Sheriff's Department?

 3         A.   I do not.

 4         Q.   But that's where she was purchased, from the

 5    Netherlands, through Alderhorst?

 6         A.   Yes.

 7         Q.   I also know Tyson Kennels is another popular

 8    one.

 9         A.   I would venture to guess they probably do the

10    same thing.  They send people over to buy dogs from

11    Europe, they bring then here where they, in turn, sell

12    them to police departments.

13         Q.   You're correct.

14         A.   Then it's basically the same thing as Tyson.

15         Q.   Okay.

16              You get Zina, she's three and-a-half years

17    old, you begin training with her?

18         A.   Yes.

19         Q.   And during those two and-a-half months, that's

20    between August of 2010 until October of 2010, you

21    worked with Zina daily; am I right?

22         A.   No.  Your first month was more of a bonding

23    phase.  And then the five weeks prior to the beginning

24    of October would have been my training academy, my

25    canine academy.  So the canine academy is only five
```

41

DEPOSITION OF DEPUTY DEREK THOMS

1    weeks, but I got her in August, I believe, right around

2    there.  I had her for about a month before I started

3    training.

4         Q.   And when you say bonding phase that is

5    creating that attachment that I talked about a little

6    bit earlier, right?

7         A.   Yes.

8         Q.   Meaning the canine or the animal gets used to

9    you, who you are, your voice and things like that; is

10   that right?

11        A.   Correct.

12        Q.   You also will begin, I guess, associating

13   yourself with the canine and understanding how the

14   canine responds to certain situations; is that right?

15        A.   In that first month?

16        Q.   Just generally.  Not in regards to police

17   work.  Just generally.

18        A.   Yeah, that's fair to say.

19        Q.   Okay.  And then, after that, you go into

20   actual police work training; is that right?

21        A.   Correct.

22        Q.   Do you recall who the sergeant was who helped

23   train with the police-work training and your

24   canine-handling training?

25        A.   The sergeant of the canine unit at the time

42

DEPOSITION OF DEPUTY DEREK THOMS

1    would have been Sergeant Horn, H-O-R-N.

2        Q.    Do you know Sergeant Horn's first name?

3        A.    Wesley.

4        Q.    W-E-S-L-E-Y?

5        A.    I think so.

6        Q.    Okay.  And is that -- I would imagine that's a

7    he.

8        A.    Correct.

9        Q.    He led the training for five weeks you were

10   involved in; is that right?

11       A.    He isn't necessarily leading.  You just asked

12   who the sergeant was of the canine -- of the canine

13   unit at the time.

14            So once a month we have a trainer named

15   Darrell Gott from LASO.  He comes up and does our

16   training.

17            And then the other month or the other --

18   sorry, the other training day in the month; there are

19   two training days per month, sometimes three but

20   usually two, and we just kind of put together drills,

21   training exercises amongst ourselves.

22       Q.    Do you put these training exercises together?

23       A.    No.  Usually it wasn't me.  It would be a

24   senior handler, kind of putting together drills 'cause,

25   you know, they have been used to it.  Basically do the

                                                        43

**DEPOSITION OF DEPUTY DEREK THOMS**

1   same drills Darrell would be doing, just he's not

2   there; he's there every other training day.

3       Q.   Is there any type of manual that you use

4   during that time that helps you understand what drills

5   you needed to be practicing on?

6       A.   No.  A lot of it is from experience, going and

7   doing things, running into -- maybe one of the handlers

8   ran into something that happened during the week while

9   he was on duty and wanted to revisit or share with the

10  other people.  You know, just kind of stuff like that.

11      Q.   Okay.  Some dogs are trained to find and bark

12  and some are trained to find and bite.  Are you

13  familiar with the difference between the two strategies

14  of training types?

15      A.   Of course, yes.

16      Q.   What was Zina trained to do?

17      A.   Find and bark.

18      Q.   Is there a particular command -- I'll ask

19  this:  Do you speak in English when you give a command

20  to Zina?

21      A.   No.

22      Q.   Do you speak in what, Dutch, or something like

23  that?

24      A.   Correct.

25      Q.   What's the command you give to Zina to find

                                                 44

DEPOSITION OF DEPUTY DEREK THOMS

1    and bark?

2         A.    It would be "revere".

3         Q.    Like Paul?  Not spelled the same?

4         A.    Not spelled the same way, yes, but like Paul

5    Revere; except for there's no lanterns.

6         Q.    All right.  And when I say find and bark what

7    does that mean to you?

8         A.    When they find the suspect they bark at them.

9         Q.    Is Zina only trained to find suspects?

10        A.    Yes.

11        Q.    I mean -- and I ask that because you tell me

12   that you have some training around drug recognition,

13   and I'm wondering if any of that translates into the

14   work that you do with Zina.

15        A.    Okay.  Like we don't use them to find people

16   besides suspects.

17             But yes, narcotics, she is trained to find

18   narcotics, also.  I misunderstood your question.

19        Q.    Okay.  So she can find narcotics.

20             Anything else?  Explosives?

21        A.    Yes.  She -- no, not explosives.  But, yes,

22   there are other things as far as like article searches.

23        Q.    What is an article search?

24        A.    Essentially, if you had somebody running and

25   they threw a gun, you know, they're running through a

45

1    park and they throw a gun she could go out and locate

2    the gun for us.  Anything that was touched, basically,

3    by a human.  She could locate keys, anything like that.

4    But it has to be in a foreign area, obviously, she

5    couldn't come into this room because we're all touching

6    stuff in here.  You know, fields, hillsides; mainly

7    stuff like that, backyards that people haven't been in

8    recently.

9        Q.    Okay.  How recent is recently?

10       A.    I mean, if nobody was in there all day or I

11   mean even a couple of hours.  Depends on the amount of

12   time, what we're looking for.  If, you know, someone

13   had just run through there and dropped something and

14   nobody's been in the backyard for a couple of hours

15   that's fine, she should be able to find it then.

16       Q.    Okay.

17       A.    It's variables.

18       Q.    Okay.  So the article search, she can find

19   narcotics.  Any other special training with Zina as far

20   as her utilization as a canine?

21       A.    No, that's about it.

22       Q.    Okay.  You are familiar with find and bite; is

23   that right?

24       A.    I am.

25       Q.    Is there a command that you give to Zina to

46

DEPOSITION OF DEPUTY DEREK THOMS

1   bite?

2       A.   Yes.

3       Q.   And what is that command?

4       A.   There are two different commands, if you want

5   me to explain both.

6       Q.   Please.

7       A.   I would use the command "stellin",

8   S-T-E-L-L-I-N, if somebody was running and I was

9   chasing somebody.  And to direct her I would yell

10  "stellin" and she would run out and bite the person

11  running.

12           And "fas", F-A-S, is a general term for

13  biting.  So, essentially, if you were standing in front

14  of me, and we were in an altercation, that would be the

15  time to say fas.  But fas can be used -- I can give her

16  this and tell her fas and she'll put it in her mouth

17  and bite.  It's kind of a general term for the

18  immediate area.  And stellin is go out and bite.

19       Q.   Okay.  It's my understanding that canine

20  police dogs are really taught bite and hold technique;

21  is that how Zina was trained as well?

22       A.   Yes.

23       Q.   And a dog bites and latches on and doesn't let

24  go; is that right?

25       A.   Correct.

47

1    Q.   At least that's how they are trained?

2    A.   Correct.

3    Q.   And that's how Zina was trained?

4    A.   Yes.

5    Q.   And you participated in training like this

6    with Zina?

7    A.   Correct.

8    Q.   And approximately how many times did you say

9    you participated in this type of training with Zina?

10   A.   I mean that would be a guess.  I mean at the

11   time the incident we had been doing it for four years.

12   We do at least every other week with full, you know, 8

13   to 12 hour days of training.  Plus in between training

14   on duty with other deputies.

15        I mean it would be -- what I would give you

16   would be a complete guess.

17   Q.   Would it be fair to say that you trained a lot

18   with Zina in regards to the biting and techniques

19   around biting; is that right?

20   A.   Yes.

21   Q.   Does it -- if you say stellin does she do a

22   different type of biting than the bite and hold?

23   A.   No.

24   Q.   What about "fas"?

25   A.   No.

48

**DEPOSITION OF DEPUTY DEREK THOMS**

1      Q.   It's still meant to bite and hold; is that

2  right?

3      A.   Yes.

4      Q.   Stellin she actually has to go and retrieve

5  something that's running or trying to escape, correct?

6      A.   Correct.

7      Q.   Do you have records around your regular

8  training with Zina?

9      A.   Yes.  I don't personally have them but yes,

10  there are records.

11      Q.   In the department; is that right?

12      A.   There should be.

13      Q.   And you mentioned that at the time of this

14  incident involving Mr. Calhoun you had been training

15  with Zina for approximately four years; is that right?

16      A.   Correct.

17      Q.   And you said every other week specifically

18  related to biting; is that right?

19      A.   Correct.

20      Q.   As I understand it, canine handlers train with

21  their canine partners every day; is that right?  Is

22  that similar to how you train?

23      A.   I mean there are days where you're obviously

24  busy where you can't -- it's just not possible.  When,

25  you know, when you first get them a lot of training in

                                                        49

**DEPOSITION OF DEPUTY DEREK THOMS**

1    apparent that he saw it.  I guess so.

2         Q.   Okay.  When you say the primer had been

3    dented, as I understand it, on the cartridge, there's a

4    primer behind the actual bullet, right?  Where the

5    hammer strikes it and sends the bullet flying; is that

6    right?

7         A.   Yes.

8         Q.   So it's your understanding that the primer of

9    the cartridge had a dent in it, which would suggest

10   that the hammer had struck it, correct?

11        A.   Suggests, yes.

12        Q.   Okay.

13             Do you know if that person died?

14        A.   No, no.  They didn't.  They actually weren't

15   even hit, so --

16        Q.   Okay.  Did you ever receive any counseling in

17   regards to that incident?

18        A.   No.  No.  I don't think so.  No, I didn't.

19   No, I didn't.

20        Q.   What about besides this incident involving

21   Mr. Calhoun while you were a dog handler, have you ever

22   pointed your gun or drawn your gun and pointed your

23   weapon at anyone?

24        A.   Yes.

25        Q.   Again, too often to recall?

63

1    A.   Less often as a handler, because my main goal,

2  my main job is dog handler, handle the dog.  So pulling

3  my gun out and -- while handling the dog, so pulling my

4  gun out wasn't as much of regular occurrence.  As --

5  for example, the deputy is behind me every time we

6  search.  They have their guns out but I don't.  So it

7  would have been would have been less because of the

8  fact that I had the dog to deal with.

9        And I have to use the restroom.  I don't know

10 if this is a good time to break.

11        MR. LACY:  Let's take a break.

12        (Recess taken from 2:18 p.m. to 2:27

13        p.m.)

14        MR. LACY:  Q.  All right.  So last we were

15 talking about your time as a dog handler where you're

16 at the Eden Township and you mentioned that you draw

17 your gun a lot less there; is that right?

18    A.   As a handler, yes, I did.

19    Q.   As a handler, because your primary duties were

20 to handle the dog; is that right?

21    A.   Correct.

22    Q.   Now, when I asked you a little bit earlier you

23 said that most of the time you let the dog do the

24 searches off the leash.  Is that still the same case,

25 that you would not have your gun drawn while your dog

64

DEPOSITION OF DEPUTY DEREK THOMS

1    Q.   Okay.

2    A.   But, yeah, so that's usually the way it's

3  done.

4    Q.   Okay.  Do you recall how you responded to the

5  call for service?

6    A.   Yeah.  So I said I would be en route.

7    Q.   Did you go code 3?

8    A.   No.  No.  I just drove, I believe.

9    Q.   Do you know what code 3 is?

10   A.   Yes, I know.

11   Q.   Would you tell us, please?

12   A.   Code 3 is lights and sirens, emergency

13  responding.

14       In this case they didn't call for it.

15   Q.   In this circumstance they didn't call for a

16  code 3 response as far as you recall, right?

17   A.   Correct.

18   Q.   You drove in your regular manner, stopping at

19  traffic lights, obeying traffic signs, to the call for

20  service?

21   A.   Correct.

22   Q.   What type of vehicle or patrol vehicle were

23  you driving, what vehicle?

24   A.   Crown Victoria.

25   Q.   Okay.  And is that a -- that's a canine

82

1   vehicle, I would imagine?

2       A.   Yes.

3       Q.   Would that mean that it has a certain things

4   in that particular vehicle specifically for deputies or

5   officers like yourself who work with canines; is that

6   right?

7       A.   Yes.

8       Q.   Would that mean that there's a fence or

9   something like that that prevents the canine from

10  jumping in the front seat?

11      A.   Yes, there's a kennel in the back.  It's a --

12  not your traditional square kennel, its a kennel

13  designed for the rear of a Crown Victoria.

14      Q.   How is it different than the regular kennel or

15  traditional kennel that you just talked about?

16      A.   It's designed for a car, so there's gua4rds on

17  the windows.  It's not all connected.  There's guards

18  on the windows, guards on the back window, there's a

19  platform and then a divider between the front and the

20  back.

21      Q.   Okay.

22      A.   The front seat and backseat.  But it takes up

23  the whole backseat and it's form fitting to the

24  backseat.

25      Q.   Okay.  When you got there do you recall

                                                            83

1    parking or where you parked at?

2        A.   Yeah.   I parked right in the middle of the

3    street.   I don't remember which street, but it was the

4    same street as the Volvo the suspect was driving.   But

5    if you had a map I could show you which street.

6        Q.   We'll get there.

7        A.   Yeah, I remember where I parked.

8        Q.   Okay.   You parked in the street and what did

9    you do?   What was the first thing that you did?

10       A.   I found out who was in charge.

11       Q.   Okay.   And how did you go about doing that?

12       A.   By asking the Oakland police officer who's in

13   charge.

14       Q.   Did they tell you who was in charge?

15       A.   Yeah.   They either pointed or gave me his

16   name, directed me towards a sergeant who was on duty

17   that night.

18       Q.   Do you recall how that particular sergeant

19   appeared, any descriptors?

20       A.   No.

21       Q.   Was he tall?

22       A.   I don't remember what he looks like at all.

23       Q.   Was he taller than you?

24       A.   I don't know.

25       Q.   How tall are you?

84

1      A.    Me, I'm 6'.

2      Q.    And you don't recall whether he was taller

3  than you?

4      A.    No.

5      Q.    You don't recall if he was heavyset?

6      A.    I think he was a little heavyset but I'm not

7  100 percent certain on that.

8      Q.    Do you recall if he was older than you?

9      A.    I think he was older than me, yes.

10      Q.    Do you recall if he was a white male?

11      A.    He's either a while white or Hispanic.

12      Q.    It wasn't African American --

13      A.    No.

14      Q.    -- Asian or Chinese, something like that?

15      A.    No.

16      Q.    Okay.  Do you recall what this particular

17  officer said to you when you first approached him?

18      A.    The sergeant?

19      Q.    Yes.

20           I apologize.  Yes.  To me you're all officers.

21      A.    I remember the gist of the conversation but I

22  don't remember the exact conversation.

23      Q.    What is the gist of the conversation that you

24  had with the sergeant?

25      A.    I asked him what was going on and he then

85

DEPOSITION OF DEPUTY DEREK THOMS

1   explained to me that it was a home invasion, not a

2   carjacking, where there was a pistol whipping involved.

3   The suspect was last seen jumping over a white fence.

4           I remember asking him how many suspects,

5   because on the Volvo that the suspect allegedly exited

6   from, the passenger door was open.  So I asked how many

7   suspects.  He said there was only one.

8           I inquired about the passenger door being open

9   and he told me it was because they had searched inside

10  the vehicle, done a cursory search of the vehicle for

11  the weapon that was used during the crime; the firearm,

12  I should say, during the crime.

13          I think we talked about the search team, the

14  amount of people on the search team.  How many I wanted

15  with me.

16          And we talked about -- I told him that --

17  about the canine announcements, that I wasn't going to

18  do a canine announcement because the suspect was armed

19  and dangerous and had just pistol whipped somebody.  As

20  far as I knew, it had just occurred.

21          That was pretty much the gist of it.

22      Q.   Okay.  All right.  You said you talked about

23  the search team, how many people were going to be on it

24  and how many people you wanted on it.

25      A.   Correct.

86

**DEPOSITION OF DEPUTY DEREK THOMS**

1      Q.   Was there some difference between how many

2   people were on the team and how many people you wanted

3   on the team?

4      A.   I just wanted to make sure there wasn't too

5   many people.  Too many people isn't good for the dogs,

6   more people talking, more people moving.  So I wanted

7   to make sure that he understood I didn't want twenty

8   people on a search team.  I wanted me, my two guys and

9   I think three of their guys.

10     Q.   Okay.  You said your two guys, what two guys

11  are those?

12     A.   Deputy Nguyen and Deputy Corey.

13     Q.   Is there a reason why you wanted those two

14  deputies?

15     A.   They were already on-scene with me.  This is

16  once we were on-scene, they were already there.

17          Obviously, I'm going utilize my own guys, we

18  worked together.

19     Q.   I don't know.  Why?  OPD guys might be better.

20     A.   That's what I'm telling you, I wanted them

21  because we worked together.  I'm familiar with them,

22  they are familiar with me.

23          You know, Oakland PD, they have their rules

24  and policies, we have our rules and policies.  We have

25  the way we do things and they have the way they do

87

DEPOSITION OF DEPUTY DEREK THOMS

1 things, you know.  And I'm not too familiar with the

2 way they do things but I know it's different than the

3 way we do things.

4      Q.   Okay.

5      A.   I just wanted to make sure that my two guys

6 were with me and no more than three or four from their

7 side to go with us.

8      Q.   Was there any direction given to them about

9 how they should be conducting the search or assisting

10 in conducting the search?

11      A.   Generally.  I don't recall specifically what

12 we talked about.  But, generally, as the canine

13 handler, I dictate where the search goes, where we

14 start and where we end.  Unless they have, you know --

15           What I'm doing with an outside agency is a

16 little bit different.  Normally, if I'm doing it from

17 my agency I mainly determine when it starts, when it

18 stops.  At another agency I give them the leeway of

19 determining when it stops, when they are done.  I don't

20 know what their call volume is.  Obviously, Oakland has

21 a higher call volume than us.  They might have to

22 leave.  So if they want to call the search they can

23 call the search.  But as long as I'm doing the search,

24 you know, I direct where we go during the search.

25           If they want to end it at any given time they

88

DEPOSITION OF DEPUTY DEREK THOMS

1   can end it.   But it will be ended along my path that I

2   have chosen.

3        Q.   You communicated this to that sergeant?

4        A.   Yeah.   I believe we talked about, you know,

5   where to start.   And I think he mentioned something

6   about an officer saying he didn't make it past this

7   point, a point that he had pointed out to me.   And

8   that's, from what I understand, where they wanted to

9   stop, which -- that's fine with me.

10        Q.   Do you recall what point that was, as you sit

11   here right now, when you say that he didn't make it

12   past this point?

13        A.   I can recall, yes.

14        Q.   Can you describe it for me in your mind?

15        A.   I believe it was the yard where the RV was

16   parked.   The fence line -- I don't know the direction,

17   but if you are facing the RV the fence to the left, I

18   believe, is where they said he didn't make it past

19   here.

20        Q.   Okay.

21        A.   So --

22        Q.   Do you know what type of fence that was?   Was

23   it a wooden fence, a metal fence?

24        A.   Sorry.   Did I know at the time or now?

25        Q.   Do you know now?

89

**DEPOSITION OF DEPUTY DEREK THOMS**

1   be -- if somebody is hiding behind a door she'll cram

2   her nose into the doorframe and really start breathing

3   and sucking in the air.  More excitement, barking,

4   scratching.  Sometimes it's as simple as a head turn.

5       Q.   When you were inside the home did Zina give

6   you any signs like this?

7       A.   No.

8       Q.   How long were you in the home?

9       A.   I don't recall.

10      Q.   Five minutes?

11      A.   Probably less than that.  Three to five

12   minutes, I would say.

13      Q.   Okay.  You said that you told the sergeant

14   that you weren't going to give a canine announcement;

15   is that right?

16      A.   Correct.

17      Q.   And he told you that that was okay?

18      A.   Yes.

19      Q.   Did you give him a reason as to why you

20   weren't going to give a canine announcement?

21      A.   I did.

22      Q.   And why is that?

23      A.   Our policy allows us to, if we're searching

24   for armed and dangerous suspects, that we don't have to

25   give a canine policy or a canine announcement.

97

**DEPOSITION OF DEPUTY DEREK THOMS**

1      Q.   That's your policy?

2      A.   Yes.

3      Q.   If you are searching for potentially armed

4   and/or dangerous suspects you don't give to give an

5   announcement?

6      A.   Correct.

7      Q.   Okay.  All right.

8           What's the next area that you searched after

9   you searched this home?

10     A.   From what I remember, there was like some

11   front yard of these -- this weird, commercial apartment

12   complex thing going on.  And we would have worked -- I

13   believe we started at the first apartment and we

14   worked -- for lack of -- forgetting which direction is

15   which over there -- to the right.  If you are facing

16   the apartment we worked to the right of that.  And then

17   around -- and then, I believe, it's to the Alcalanes

18   side.  So we -- for the first part we went to the right

19   and we moved all the way towards the Alcalanes.

20     Q.   So you actually went to Alcalanes and were

21   searching those yards?

22     A.   Yes.

23     Q.   Would those be front yards?

24     A.   Those were the front yards to the backside.

25   Those are backyards that are fenced off.  So the front

                                                        98

DEPOSITION OF DEPUTY DEREK THOMS

1    Q.   30 seconds each yard?

2    A.   About.  And then the time to walk around.

3    Q.   Okay.  And then you got to the front.  Did you

4    take more time in the front than in the Alcalanes side?

5    A.   Not so much in the front but in the rear we

6    were taking more time.  There was less spots to hide in

7    front, in the front of the houses.  There was more

8    hiding in the rears.  So we wouldn't have spent as much

9    time in the front as in the rear.  But, depending on --

10   like one house had a big wrought iron gate that was --

11   cars.  And we searched that a little bit more than we

12   would the other front yards.

13   Q.   How did you access the rear yards of the homes

14   on the Alcalanes side?

15   A.   With the permissions of the homeowners.  One

16   had to be unlocked.  I think a couple we could just

17   walk right back there.

18   Q.   Okay.

19   A.   But with their permission, depending how to

20   get back there.

21   Q.   Okay.  So somebody would have knocked and

22   announce, hey, we're here, we need to search; or

23   something like that?

24   A.   Exactly.  We don't want to go into people's

25   backyards with them not knowing and without their

100

DEPOSITION OF DEPUTY DEREK THOMS

1    permission.

2         Q.    That's generally why you give an announcement,

3    right?

4         A.    For the other people?  Yeah.

5         Q.    Yeah.

6         A.    Yeah.  For the suspect and the other people.

7         Q.    'Cause there could be normal citizens back

8    there and you don't want your dog to find and attack or

9    bite somebody who is innocent of any crime, correct?

10        A.    Correct.  The announcement is sort of more

11   geared toward the suspects because we knock on people's

12   doors and talk to them and make contact with them

13   before we go into their property, you know.  So --

14             But the announcement is more geared towards

15   the suspect in giving up, but it does alert citizens to

16   the presence of a police dog.  But it's more important,

17   you know, if someone is sitting in there watching the

18   Warriors play-off game they might not hear my

19   announcement.  So it's important to me to ensure the

20   safety of the citizens that we knock on each door and

21   physically make contact with them to one, notify them

22   of our presence.  Ask permission to be on their

23   property.  And, you know, if there's dogs in their

24   backyard, small dogs, big dogs, I don't want my dog

25   getting hurt, I don't want their animals getting hurt.

                                                        101

1    because they know what to ask.  So -- there's a list of

2    questions that I like to have asked.

3        Q.   Are there any children here in the backyard,

4    in the house, in the tree house or anything like that?

5        A.   Correct.

6             Is there anyone living back there?  Is there

7    anyone in your house?  Is there anyone that's supposed

8    to be in your backyard right now?  Do you have any

9    animals back there?  If so, can you bring them in?  Are

10   they caged?  You know, what's going on is all sorts of

11   questions that we would ask prior to entering on

12   someone's premises.

13       Q.   On this occasion, on August 3rd, and when you

14   came around to the Alcalanes side, any of those doors

15   that you knocked on, did they indicate that there was

16   somebody in their backyard that was supposed to be

17   there?

18       A.   Actually out and about in the backyard, no.

19   But one of the residents said their son, I believe,

20   lived in the backyard in a detached apartment, if you

21   will.

22       Q.   Yeah.

23       A.   So I remember -- I think they called him on

24   the phone and he came out of the backyard.

25       Q.   Okay.

                                                        103

**DEPOSITION OF DEPUTY DEREK THOMS**

1        A.    So I believe that was the only one.

2        Q.    Okay.  So besides that, the yards you were

3    searching, as far as you understood, were supposed to

4    be empty?

5        A.    Correct.

6        Q.    And that is on the Alcalanes side, correct?

7        A.    Correct.

8        Q.    After you finished searching the front part of

9    the Alcalanes side, what do you do?

10            MR. MURPHY:  Are you talking about that

11    apartment building?

12            MR. LACY:  Q.  So after the apartment

13    building, it's my understanding that you go yard to

14    yard on the Edna side; is that right?

15        A.    Yes.

16        Q.    And you circle around and come to the

17    Alcalanes side and you search the front yards, and then

18    the rear yards of the homes on the Alcalanes side; is

19    that correct?

20        A.    Correct.  But we do front yard, rear yard of

21    each house.  We don't search all the front yards and

22    then move into the back yards.  It's front yard, rear

23    yard; front yard, rear yard.

24        Q.    Clearing each home as you go down the street?

25        A.    Correct.  Each lot.

                                                      104

**BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters**
1659 Scott Blvd., Suite 15, Santa Clara, CA  95050  -  (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)

DEPOSITION OF DEPUTY DEREK THOMS

1     Q.   Okay.  Each lot.

2          And all those lots were clear, right?

3     A.   On the Alcalanes side?

4     Q.   Yes.

5     A.   I think, technically, they are all Alcalanes

6     addresses, so one wasn't clear.  No.

7     Q.   Which one was that?

8     A.   I don't remember the address of it.  The one

9     with the RV in it.

10    Q.   Was that one of the first ones you searched on

11    the Alcalanes side?

12    A.   No.  I think it was the third.  Second, third,

13    somewhere right around there.  There wasn't very many

14    houses we searched.  I think there was only four or

15    five.

16    Q.   Okay.  What gave you the understanding

17    initially that the backyard --

18         Let me ask you this:  Was it the front yard or

19    the backyard?

20    A.   For Corey?

21    Q.   The suspect.

22    A.   Oh, it's kind of -- the set up.  I guess it's

23    technically the backyard he would have been in,

24    technically.

25    Q.   That's where you initially realized there's

                                                    105

DEPOSITION OF DEPUTY DEREK THOMS

1    possibly a suspect in the backyard; is that right?

2        A.   Yes.   But not in the backyard of the house we

3    were in.

4        Q.   In the backyard of another house?

5        A.   Correct.

6        Q.   What gave you the understanding that there may

7    be somebody in the backyard of another house?

8        A.   Zina.

9        Q.   What did Zina do?

10       A.   She became really animated, running up and

11   down the fence line.  I don't know if she was barking

12   or not, just kind of whining; trying to jump over the

13   fence.

14       Q.   Had you given any other command besides the

15   revere command at this point?

16       A.   Up until we were in that yard?

17       Q.   Until Zina started becoming very animated, had

18   you given any other command?

19            MR. MURPHY:  Throughout the entire search?

20            THE WITNESS:  I'm not sure.

21            MS. LACY:  Q.  Okay.  You wouldn't have given

22   the -- what is it?  The fas command, would you?

23       A.   No.

24       Q.   There was nothing for Zina to bite?

25       A.   Correct.  Yeah.

                                                         106

1    A.   I think the incident happened about

2  6:00 o'clock in the morning, so that the end of it.  It

3  would have been right around 6:00 o'clock in the

4  morning.

5    Q.   Okay.  When Zina starts becoming animated,

6  kind of breathing a little bit heavier, and you said it

7  seemed as if she wanted to jump over the fence; is that

8  right?

9    A.   Yes.

10    Q.   What did you do?

11    A.   Then I told her to lay down.

12    Q.   And what else?

13    A.   And then we had a -- me and another Oakland

14  officer had conversation of what to do next.

15    Q.   Do you recall which officer that was?

16    A.   No, I don't.

17    Q.   Do you recall if it was the sergeant that you

18  spoke with earlier?

19    A.   I don't think he came on the search with us.

20    Q.   Okay.  So he remained on outer perimeter of

21  these homes?

22    A.   I believe so.

23    Q.   Okay.

24    A.   To my knowledge.

25    Q.   Okay.  You spoke with an OPD officer about

                                                      109

1  what you are doing to do after you told Zina to lay

2  down?

3       A.   Correct.

4       Q.   Did you explain to this OPD officer what you

5  had observed about Zina?

6       A.   Yes.

7       Q.   And what did you tell them?

8       A.   That I believed that there was somebody in the

9  backyard of the -- the next backyard over from us.

10      Q.   Okay.  And --

11      A.   Backyard with the RV.

12      Q.   Okay.  And how did you get that impression?  I

13  mean how did you communicate that to them?  Did you go

14  whisper in a corner or, "hey, somebody's over there";

15  you point.  Or what do you do?  I mean you don't want

16  to alert the criminal, right?

17      A.   It was probably more of a low conversation,

18  low-volume conversation, I would say.  I wouldn't be

19  yelling it.

20      Q.   Okay.  What did this officer tell you, what

21  you guys should do?

22      A.   I believe they gave him some options as far

23  as -- I think that I proposed to him that we rip the

24  fence boards down between the two houses and send Zina

25  in that way.  And then we would follow.

110

DEPOSITION OF DEPUTY DEREK THOMS

1       A.    Revere.

2       Q.    Okay.  Which means to find and bark?

3       A.    Correct.

4       Q.    When you gave Zina the command to lay down did

5   she listen?

6       A.    Yes.

7       Q.    Immediately?

8       A.    I believe so.

9       Q.    What's the command to lay down?

10      A.    Off.

11      Q.    Off?  Like turn it off?

12      A.    I think it's a spelled different way.

13      Q.    I would imagine it is.

14            Okay.  Then she lays down.  She lays down

15   until you give her another command; is that right?

16      A.    Is that what happened?

17      Q.    Yes.

18      A.    No.

19      Q.    What happened?

20      A.    She layed down.  And then she jumped the

21   fence.

22      Q.    She jumped the fence on her own?

23      A.    Yeah.  When we started going towards her she

24   jumped the fence.

25      Q.    You didn't give Zina the command to jump the

                                                           112

1    fence?

2        A.   No, I did not.

3        Q.   Is that unusual for Zina?

4        A.   No.  When we all started moving towards her I

5    would assume it's time to get up and go.  Also, you

6    know, I don't know what she heard in the backyard.  She

7    may have heard something.

8             But it wouldn't be out of the ordinary -- it

9    would be out of the ordinary if I told her to lay down

10   and I stood there and she got up and moved, but it

11   wouldn't be out of the ordinary if I told her to lay

12   down and then we all started moving towards her and

13   then she got up.  That would not be out of the

14   ordinary.

15       Q.   That's expected?

16       A.   Yes.

17       Q.   She knows -- she's trained that when -- after

18   you tell her to lay down if you move towards her in a

19   large group of people that she can get up?

20       A.   Yeah.  I allow her to, yes.

21       Q.   Okay.  She gets up and jumps the fence in a

22   single bound, as they say; is that right?

23       A.   I believe so.

24       Q.   Do you have an estimate of how long it took

25   Zina to jump that fence?

                                                        113

**DEPOSITION OF DEPUTY DEREK THOMS**

 1    Q.   Okay.  You walked up to the fence.
 2         Do you draw your gun?
 3    A.   No.
 4    Q.   Why not?
 5    A.   'Cause I have people with guns out already.
 6    Q.   Do you recall how many officers were in that
 7  yard with you?
 8    A.   There was my two guys and, I think, three
 9  Oakland officers.  I think.
10    Q.   Okay.  You walked up to the fence.  What do
11  you do when you walk up to the fence?
12    A.   Look over.
13    Q.   You can look over this fence?
14    A.   Yes.
15    Q.   How did you look over?
16    A.   On my tippy-toes.
17    Q.   You had to get on your tippy-toes?  So would
18  that mean that the fence was about 6 feet high?
19    A.   Yes.
20    Q.   Okay.  Did you have to pull yourself up any?
21    A.   I don't remember.
22    Q.   Okay.  What did you see after you got on your
23  tippy-toes?
24    A.   I saw the subject running away from our
25  location.  So -- it's easier with a diagram, but -- so

                                                      115

1    we are facing north, I think, towards the RV.  So we

2    are in the backyard of one house, past the RV.  Now

3    we're looking into the backyard with the RV.  So that

4    direction.

5            So it would have been to my left I saw the

6    suspect running, with my dog, behind the RV.

7        Q.   You saw the suspect running with your dog?

8        A.   Correct.

9        Q.   When you say running with your dog, did they

10   have a job together?  What were they doing?

11       A.   It looked like she was biting him.

12       Q.   So the dog was biting him.  Could you see

13   where she was biting him at?

14       A.   To me it looked like one of the arms.

15       Q.   Could you tell how this subject was dressed at

16   this time?

17       A.   Dark clothing.

18       Q.   Did he appear to have on jeans or slacks,

19   dress shoes?

20       A.   That would be -- I don't really remember.

21       MR. MURPHY:  Don't guess.

22       THE WITNESS:  I don't really remember.

23           What my thought was when I looked at him, I

24   just remember seeing dark clothing.

25       MR. LACY:  Q.  Did anything stick out to you

                                                         116

**DEPOSITION OF DEPUTY DEREK THOMS**

1    about the way the subject was dressed?

2        A.    The way he was dressed?  No.

3        Q.    Okay.  Did you see the subject's hands?

4        A.    No.

5        Q.    You said it appeared that Zina was biting one

6    of his arms?

7        A.    Correct.

8        Q.    Is there a particular place on the arm that

9    Zina was biting him?

10       A.    From where I was, the forearm.

11       Q.    Do you have a recollection of which forearm it

12   was?

13       A.    I believe it was the left.

14       Q.    Okay.  Zina was biting him on the left

15   forearm.  Could you see was Zina on his left side then?

16       A.    Yes.

17       Q.    Or was Zina on the right-side front biting the

18   forearm?

19       A.    So, from my angle, I could see Zina with her

20   back two paws on the ground, her front two paws off the

21   ground, which is the reason that I am arriving at the

22   possibility that she was biting him.  I could not see

23   'cause it was so dark, I could not see what was

24   actually going on, but I could see -- there was a

25   little bit of light behind them, I could see that her

                                                    117

1    front two paws were off the front and her back paws

2    were still on the ground, so that would suggest to me

3    that she was biting him.

4        Q.   Okay.  Did you give Zina any command to bite?

5        A.   No.

6        Q.   Was that normal, for her to search and bite

7    someone?

8        A.   So the way it works is, with the guard and

9    bark is, if the suspect is surrendering and giving up

10   and not moving she will bark at him.  If they attempt

11   to run or attack them or me she will engage them with a

12   bite.

13            So when I looked over the fence he was running

14   and she was either trying to bite him or had bitten

15   him, I'm not sure if she was actually biting him at

16   that time.

17       Q.   It appeared as if she may be?

18       A.   Right.  But he wasn't screaming either, and

19   everybody she's bit screams.  So, you know, one word or

20   another, you know, they make a noise.  He wasn't making

21   any noise so I'm not 100 percent sure.

22       Q.   When you peeked over the fence did you give my

23   command to Zina to search or to bite or to lay down?

24       A.   No.  I believe I said to the suspect let me

25   see your hands, let me see your hands.

                                                        118

DEPOSITION OF DEPUTY DEREK THOMS

1    Q.   When you peeked over the fence?

2    A.   Correct.

3    Q.   And the suspect began trying to run away?

4    A.   Correct.  Well, when I looked over the fence

5  he was already running away, so he didn't begin

6  running, he was already running away.

7    Q.   Okay.  What did you do after -- at this point,

8  then?

9    A.   I yelled let me see your hands, let me see

10  your hands.

11        And then, when I saw them go around the back

12  of the RV, I said something about my dog to the other

13  deputies and officers that were there, and then I

14  jumped over the fence.

15    Q.   Okay.  You jump over the fence, what did you

16  intend to do?

17    A.   To go chase after the subject with my dog.

18    Q.   Did you give my commands to Zina?

19    A.   No.

20    Q.   Why not?

21    A.   Because she knows what to do and it's not

22  necessary for me to give her any commands.  It was more

23  on my mind to catch up with them.

24    Q.   Okay.  And when you got over the fence what do

25  you see?

119

1      A.   When I jumped over the fence I look to my

2   left, I didn't see the subject or my dog anymore.  I

3   took a couple steps forward.  I heard something coming

4   from directly in front of me, however, I was looking to

5   my left.  I was -- I had landed on the top of the hood

6   of a black truck.  When I got to the edge of the black

7   truck and I heard the noise that was directly in front

8   of me I looked to my right and saw the subject running

9   at me with Zina right with him.

10      Q.   Okay.  Did that surprise you?

11      A.   Absolutely.

12      Q.   Why?

13      A.   Because I've never had a guy not scream and

14   run at me with the dog biting him.

15      Q.   Have you ever had people try to run away from

16   the dog?

17      A.   Run away from, yes.  But not after they have

18   been bitten.

19      Q.   So after Zina bites somebody people just sit

20   down?

21      A.   They give up.  Yeah.  They don't just sit

22   down, you know.  But, generally -- well, I shouldn't

23   say give up because that's not true.  They are

24   preoccupied with the dog, basically.  I've had people

25   trying to poke her eyes out, punch her, kick her, choke

120

1    her; but not run.  That's a better way of saying it.

2        Q.    Okay.  How far was the suspect from you?

3              MR. MURPHY:  At what point?

4              MR. LACY:  Q.  When you see him coming at you

5    and Zina trailing right behind?

6        A.    10 to 15 feet.

7        Q.    Was your weapon drawn at this point?

8        A.    No.

9        Q.    Did you draw your weapon at this point?

10       A.    I did.

11       Q.    Did you give any commands?

12       A.    No.  I thought I had, but once I got over the

13   fence I had not given any commands, no.

14       Q.    Okay.

15       A.    And after drawing my weapon I didn't give any

16   commands.

17       Q.    Did you -- could you tell if he could see you?

18   Did you guys make eye contact?

19       A.    I don't remember eye contact.  I mean I was

20   right in front of him.

21       Q.    Okay.

22       A.    But, I mean, testifying to what he is

23   thinking, I don't know.  If he saw me, I don't know.  I

24   don't specifically remember locking eye contact with

25   him, though.  I remember more looking down at Zina and

121

1    his hands, is what I remember looking at, so I wasn't

2    looking at his face to even see if he was looking at

3    me.

4        Q.   Were you concerned about his hands?

5        A.   Yes.

6        Q.   Why?

7        A.   Because hands hurt cops.  I mean, if you are

8    going to harm a cop it's because you have something in

9    your hand.  Knife, gun, bat; whatever it is.  So the

10   first area of my concern with somebody charging at me

11   with my dog what do they have in their hands?

12       Q.   Okay.  Did you see anything in his hands?

13       A.   I couldn't really see his left hand very well

14   because it looked like Zina was biting there somewhere,

15   or attempting to.  She was on the left-hand side.  And

16   I remember seeing his right hand reaching down by his

17   belt buckle.

18       Q.   Okay.  Did that concern you?

19       A.   Yes.

20       Q.   Why?

21       A.   Because generally that's where people

22   illegally carry firearms.

23       Q.   So you thought he may have a firearm?

24       A.   Correct.

25       Q.   Did you see a firearm?

                                                          122

1     A.   No, I did not.

2     Q.   Did you see anything that appeared to be a

3 firearm?

4     A.   No, but it was dark.

5     Q.   So you couldn't see?

6     A.   No.  I couldn't see anything that appeared to

7 be a firearm, no.

8     Q.   You could see his hand near his waist section?

9     A.   Yes.

10     Q.   And so you thought he might be going for a

11 gun?

12     A.   Correct.

13     Q.   So what did you do?

14     A.   So I withdrew my firearm from my thigh rig and

15 as he continued at me, you know, I feared for my life.

16          I'd never encountered this type of situation

17 before with somebody charging at me, not making a

18 sound, with a police dog biting them.

19          So, as he was coming at me, then right where

20 his waistband is I see a huge burst of light coming out

21 of the waistband area and I thought he had discharged a

22 round.  And within a split second from seeing that

23 light I discharged my firearm at the subject.

24     Q.   Could the light you saw coming from his waist

25 been from your gun?

                                                    123

**DEPOSITION OF DEPUTY DEREK THOMS**

1          MR. MURPHY:  I'm going to object.  It calls

2     for speculation.

3          THE WITNESS:  I can actually answer that

4     because my light is an LED light, which has a blue hue

5     to it.  No, it was not my light.

6          Q.   I mean the discharge from your gun, could it

7     have been --

8          A.   I had not discharged my firearm at that point.

9          Q.   When you saw this light --

10         A.   And it came from him.

11         Q.   Okay.

12              So you saw a light at his waist; is that

13    right?

14         A.   Correct.

15         Q.   And right in the center of his waist?

16         A.   Right about there.

17         Q.   All right.

18              Was there any overhead light shining on the

19    area or anything like that?

20         A.   No.  There was a lightbulb which I believe is

21    what he ran into, which is what sparked the flash.

22    There was a light mounted on a pole next to him.  And

23    in between me and him, and as he was running past it --

24    I believe it was mounted about waist height.  And he

25    hit it and it exploded right in there, right in that

                                                    124

1    area, and I thought it was a firearm.  I thought it was

2    a firearm discharging.

3         Q.   Did you hear a shot?

4         A.   No.  But that's not out of the ordinary.

5         Q.   It's not -- what's not out of the ordinary?

6         A.   To hear gunshots when you are under that much

7    stress and fearing for your life.

8              When my partner shot at the other guy I didn't

9    recall hearing any gunshots.  When I shot the dog I

10   don't real hearing the gunshots.  And when I discharged

11   my firearm at the subject I don't recall hearing loud

12   gunshots, either.

13        Q.   Have you ever been diagnosed with PTSD?

14        A.   I have not been.

15        Q.   Have you ever been treated for any anxiety or

16   psychological disorder?

17        A.   No, I have not.

18        Q.   Okay.  How many times did you fire your

19   weapon?

20        A.   I believe it was six to eight times.

21        Q.   After the first shot did you still feel

22   threatened?

23        A.   Yes.  He was still coming at me.

24        Q.   How fast was he coming at you?

25        A.   I mean I don't know how fast he was running,

                                                    125

1   it seemed really fast at the time, you know.

2        Q.    After the first shot how much closer had he

3   gotten to you, or was he still at the ten or fifteen

4   feet range?

5        A.    No.   When I made my first shot he was within

6   five feet from me.   So he was still coming at me the

7   whole way until I fired my last shot.

8        Q.    Okay.   So when you fired your first shot he

9   was within five feet of you?

10       A.    Yes.

11       Q.    And he continued coming the whole way?

12       A.    Correct.

13       Q.    How close was he at the time of your last

14   shot?

15       A.    It happened so fast, but I believe it was

16   basically right underneath me, 'cause I was standing on

17   top of the car and he was underneath me.   I believe he

18   even hit the car right at my feet and then fell to the

19   left, to the RV and truck.   But he was like literally

20   right there, touchable.

21       Q.    So you were still on top of the car?

22       A.    Yes.

23       Q.    Had you notice any of your supporting officers

24   had hopped the fence as well?

25       A.    I didn't notice.   I was too focused on him

126

1    running at me.

2        Q.   Okay.  Did you have any understanding between

3    the second and third shots about whether or not he

4    still presented a danger to you?

5        A.   Up until the last shot I took I felt that he

6    presented a danger to me.  And once I saw him start to

7    fall is when I stopped because I wanted to reassess, to

8    see if he was still a danger to me.

9        Q.   Okay.  So that was after the six to eight

10   shots?

11       A.   Yes.

12       Q.   So you did not reassess in between the shots?

13       A.   No.  Because he was still coming at me, so I

14   didn't stop moving and reassess because he was coming

15   right at me.

16       Q.   Okay.

17       A.   So when he stopped and started to fall down to

18   the ground is when I took the opportunity to reassess

19   the situation.

20       Q.   Okay.  You know that this person's name was

21   Jacorey Calhoun?

22       A.   I do.

23       Q.   Had you ever run into this man before?

24       A.   I had not.

25       Q.   Had you ever heard of him before?

127

DEPOSITION OF DEPUTY DEREK THOMS

1    A.   I did not.

2    Q.   You had no prior interactions with him?

3    A.   I did not.

4    Q.   Did you have an understanding that he was an

5 armed and dangerous -- had a history of being armed and

6 dangerous?

7    A.   At the time I did not know his past, but I

8 knew that the reason we -- he was being sought after

9 was for the home invasion with a pistol whipping.

10    Q.   Okay.  All right.  What do you do immediately

11 after Mr. Calhoun falls to the ground?

12    A.   I jump off the car and reassess.

13    Q.   Where do you land?

14    A.   Kind of by the driver's side headlight.

15    Q.   Okay.  The driver's side headlight?

16    A.   Correct.  On the side of the car, though, not

17 in front.

18    Q.   Okay.

19    A.   I would have been basically at the fender, but

20 driver's side fender.

21    Q.   What did you notice while you were

22 reassessing?

23    A.   I wanted to make sure that I didn't just kill

24 my dog because I know that she was right with him but I

25 felt that my life was in danger enough that if I shot

128

DEPOSITION OF DEPUTY DEREK THOMS

1    my own dog that, you know, so be it.  I wanted to save

2    my own life.

3              So I jumped down and looked and I could see

4    that Zina is still standing.  She is now biting his

5    left leg, I believe.  And I look at Mr. Calhoun and I

6    can see that he has obvious signs of, to me, death.

7        Q.   What signs were those?

8        A.   He was -- he had blood coming from the top of

9    his head.

10       Q.   You said he had blood coming from the top of

11   his head?

12       A.   Yes.

13       Q.   Did you see anything else coming from the top

14   of his head?

15       A.   Yeah.

16       Q.   What did you see?

17       A.   It looked to be brain matter to me.

18       Q.   Did that disturb you?

19       A.   Yeah, a little bit.  But, you know, I mean,

20   when it comes to, you know, me going home and my life,

21   you know.  But, yeah, I mean it's a tragedy,

22   absolutely.

23       Q.   Did you attempt to give him medical attention?

24       A.   I did not at that point in time.  It was best

25   for me because, again, my responsibility is the canine,

129

DEPOSITION OF DEPUTY DEREK THOMS

1          THE WITNESS:  No.  Once I jumped over I

2     haven't given any commands.  After I jumped I had not

3     given any commands.

4          MR. LACY:  Q.  Yes.  No commands to either

5     Mr. Calhoun or Zina; is that right?

6          A.  Correct.

7          Q.  And then you say you saw Mr. Calhoun coming in

8     between this truck labeled S6 and the trailer; is that

9     right?

10         A.  Correct.

11         Q.  And then you began to fire; is that right?

12         A.  Not immediately, but soon after.  I didn't

13    have my gun out so I had to draw -- you know, look at

14    what he's doing and then draw and then lift my gun and

15    everything.

16         I mean it was quick but it wasn't immediately.

17    He was, I would say, right about where the left side of

18    the trailer is.

19         Q.  Okay.

20         A.  This corner of the trailer is right about

21    where he was.  Right about here, when I started

22    shooting, right at that corner.

23         Q.  Okay.  I'm going to want you to mark that, if

24    you can.

25         A.  Okay.

                                                         137

DEPOSITION OF DEPUTY DEREK THOMS

```
 1        A.   I believe one was done -- to my knowledge, one
 2   was done.
 3        Q.   Did you fill out any portion of it?
 4        A.   I did not fill out any report but I was told
 5   it was done.  I can't recall by who but --
 6        Q.   Okay.
 7        A.   They said everything would be taken care of.
 8        Q.   Nothing that you did, though?
 9        A.   Nothing that I did personally, no.
10        Q.   Okay.
11             MR. LACY:  Let's mark this as 13.
12             (Exhibit 13 was marked for
13             identification.)
14             MR. LACY:  Q.  Do you see what I put before
15   you marked as Exhibit 13?
16        A.   I have.
17        Q.   Do you recognize that?
18        A.   I do.
19        Q.   What is it?
20        A.   It's the use of force continuing matrix for
21   the Alameda County Sheriff's Office.
22        Q.   You've viewed this before?
23        A.   Oh, yes.
24        Q.   You say oh, yes.  That suggests to me that you
25   reviewed it quite a few times.
```

143

DEPOSITION OF DEPUTY DEREK THOMS

1      A.   Yes.  It's been reviewed quite a few times.

2      Q.   Have you gotten any trouble and had to review

3  it more than once or --

4      A.   No, it's part of our continual training that

5  we do.  Obviously, in the academy they use this as an

6  example.  You know, it's different for everyone's

7  agency but because Alameda County Sheriff's Office is

8  teaching it they use theirs.  And through the continual

9  professional training that we go through, you know,

10  they bring it up then.  Usually in detack (sic).

11      Q.   Okay.  I want to know, you see these different

12  boxes here, there's lots of boxes, I guess.  But

13  there's an arrow on the bottom of this page, the bottom

14  left corner, that says actions of the subject; do you

15  see that?

16      A.   Oh, yes.  Okay.

17      Q.   And it points to some words starting with

18  cooperative; is that right?

19      A.   Yes.

20      Q.   Passive or low level of resistence; is that

21  right?

22      A.   Correct.

23      Q.   Active resistance or assaultive behavior; is

24  that right?

25      A.   Correct.

144

BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA  95050  -  (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)

**DEPOSITION OF DEPUTY DEREK THOMS**

1          Q.    Life threatening assault or assault likely to
2     cause great bodily harm?
3          A.    Correct.
4          Q.    All right.  Which of these would you
5     categorize as Mr. Calhoun's behavior at the time you
6     shot him?
7          A.    To me, would be life threatening.
8          Q.    Life threatening assault or assault likely to
9     cause great bodily harm; is that right?
10          A.    No.
11          Q.    Had he touched you?
12          A.    No.
13          Q.    Had he said anything to you?
14          A.    No.
15          Q.    Had he pointed a gun at you?
16          A.    No.
17          Q.    Did you visibly see any weapon in his hand?
18          A.    No.
19          Q.    But yet you found that to be life threatening;
20     is that right?
21          A.    Correct.
22          Q.    Because he was charging at you, in part; is
23     that right?
24          A.    In part, yes.
25          Q.    And he wasn't making sounds when the dog was

145

**DEPOSITION OF DEPUTY DEREK THOMS**

1    Mr. Calhoun had committed a violent felony; is that

2    right?

3        A.    That is correct.

4        Q.    The sergeant from Oakland Police Department

5    told you that he had just pistol-whipped somebody and

6    fled; is that right?

7        A.    That is correct.

8        Q.    And that they didn't find the gun inside the

9    car; is that right?

10       A.    Correct.

11       Q.    So you believed that he had a gun on him?

12       A.    Correct.

13       Q.    You did not see a gun on his person, though;

14   am I right?

15       A.    Correct.

16       Q.    But the sergeant, you would say, led you to

17   believe that he had a gun on him?

18       A.    Correct.

19       Q.    Did tell you that he thinks he has a gun on

20   him?

21       A.    I recall him telling me about the

22   pistol-whipping to advise me that he was wanted for a

23   crime that was committed with a firearm.  I don't

24   recall him saying I believe he has a gun, or anything

25   like that.  But the information that he committed a

149

DEPOSITION OF DEPUTY DEREK THOMS

1    crime with a gun was relayed to me.

2        Q.    Okay.  Did he tell you when that crime may

3    have occurred?

4        A.    No, he didn't.  I was --

5            MR. MURPHY:  You answered him.

6            MR. LACY:  Q.  Go ahead.  You were --

7        A.    I was under the belief that it had just

8    occurred.

9        Q.    What gave you that belief?

10       A.    'Cause he didn't say it was a month ago.  He

11   said that they were chasing a guy for a home invasion

12   with a pistol whipping?

13       Q.    So then it was your mistaken belief that that

14   thing had just occurred that night?

15           MR. MURPHY:  Objection.  That's not his

16   mistaken belief to reasonably rely on what an officer

17   communicated to him.

18           MR. LACY:  Sure.

19           MR. LACY:  Q.  Did you understand that

20   question?

21       A.    Yeah.  Yes.  I understand the question.

22           MR. MURPHY:  I'm just objecting to the

23   characterization that it was his error.

24           THE WITNESS:  I don't believe that it was

25   my error.

                                              150

DEPOSITION OF DEPUTY DEREK THOMS

1    what that person is thinking, what they are going to

2    do.  In this situation he did flank me from the right

3    and come right at me.  So I'm absolutely happy that I

4    put her in that situation.

5        Q.   Okay.  When you were over the fence, before

6    your had hopped over and jumped onto the truck, you had

7    peeked over and you could see the suspect, Mr. Calhoun,

8    running away from behind the truck and headed towards

9    the area behind the trailer; is that right?

10       A.   The RV?

11       Q.   The RV.

12       A.   Yes.

13       Q.   Did you give any direction to these officers

14   that were behind you?

15       A.   I don't remember what I said.  I know that I

16   said something in regards to my dog.  I don't remember

17   what I said, though.

18       Q.   All right.  Do you recall giving your

19   statements and seeing that you saw Mr. Calhoun punching

20   your dog?

21       A.   Yes.

22       Q.   So you could see his hands?

23       A.   I could see the elbows coming -- his right

24   elbow coming back.  And I could see her -- him swinging

25   the dog back and forth and hitting her on stuff that

                                                      159

1    of jumping over the fence.  I had radio contact.  He

2    didn't enter a building.  And there were sufficient

3    deputies to provide backup and containment and he was

4    already in containment.  Wasn't increasing the risk to

5    the public.

6         Q.   And I want to talk a little bit about that.

7         A.   Basically, none of them -- oh, there's more.

8         Q.   And I want to talk a little bit about that.

9    Something you said I think is important.

10        A.   Okay.

11        Q.   The suspect was contained.

12        A.   Correct.

13        Q.   He was in a yard.

14        A.   Correct.

15        Q.   He had Zina, a very capable and trained

16   canine, biting him.

17        A.   Correct.

18        Q.   Why was it necessary to hop over until you

19   knew he was subdued?  He sat down or lay down.  Why

20   didn't you tell him hey, lay down and we'll make sure

21   the dog doesn't bite you anymore.  Lay down.

22        A.   'Cause the whole thing was different.  He's

23   running with her, he's not screaming, he's not doing

24   all the normal things that I'm used to seeing on every

25   other deployment I've been on.  It was different.  In

166

1    my mind, there was something wrong.  Something

2    different.  And, you know, not having been in that

3    situation, having seen that, I reacted to what I felt

4    was reasonable.

5        Q.   Okay.  When you say it was different, what do

6    you mean?

7        A.   He wasn't screaming, he wasn't yelling, he was

8    running with her.  I didn't know where he was going.

9        Q.   Okay.

10        A.   Or what he was doing.

11        Q.   If we look back at Exhibit -- I think this is

12    11.  I mean he's pretty confined in this yard here,

13    right?  There's not much area for him to go; would you

14    agree?

15        A.   Well, I don't know any of the stuff that was

16    back here.

17        Q.   Hadn't you searched that area already?

18        A.   No.  This was all fenced off.  I had only

19    searched this portion and I couldn't see anywhere other

20    than here.  I didn't know what was over in this area.

21        Q.   Okay.  What did you think was over there?

22        A.   I don't know.

23        Q.   A yard?

24        A.   Yeah.  I mean somewhere else he could run.

25    Now, taking the dog with him, he's not screaming.  You

167

DEPOSITION OF DEPUTY DEREK THOMS

```
 1            MR. LACY:  Q.  This flash, you said a bulb
 2   popped.
 3        A.   Correct.  That's what I believe --
 4        Q.   Where was Mr. Calhoun, if you could point to
 5   it on this picture, when you said the bulb popped?
 6        A.   Right here.
 7        Q.   Okay.  Right here?
 8        A.   You can see the light socket.
 9        Q.   The light socket?
10        A.   Where there's the light socket hanging.
11        Q.   Above number 9, right?
12        A.   Yes.
13        Q.   That's where you saw a flash of light?
14        A.   Correct.
15        Q.   Okay.  And then you fired?
16        A.   Right.  But -- yeah.
17        Q.   Okay.  We'll do one more.  25.
18             (Exhibit 25 was marked for
19             identification.)
20             MR. LACY:  Q.  Then I may let you go.
21             MR. MURPHY:  Promises promises.
22             MR. LACY:  Q.  All right.  This is 25.
23             You see this document that I put before you?
24        A.   I do.
25        Q.   It says the Alameda County Sheriff's Office
```

192

**DEPOSITION OF DEPUTY DEREK THOMS**

1   general order.  And under subject it says use of force;

2   do you see that?

3        A.   Yes, I do.

4        Q.   Are you familiar with the policy in the use of

5   force?

6        A.   Yes.

7             MR. MURPHY:  And again, I would just note for

8   the record, that this version appears to be revised a

9   year following the incident.

10            MR. LACY:  Sure.

11            MR. MURPHY:  There's a revision date of

12   July 2014.

13            MR. LACY:  Duly noted.  Thank you, counsel.

14            MS. LACY:  Q.  If you look to section F, it's

15   on page 5 of 11; do you see that there?

16       A.   Yes.

17       Q.   It talks about the use of intermediate force.

18       A.   Yes.

19       Q.   And the first use of intermediate force it

20   talks about is the use of agent's canine; is that

21   right?

22       A.   Yes.

23       Q.   Under A, do you see what it says?

24       A.   Yes.

25       Q.   Can you read that to me?

193

DEPOSITION OF DEPUTY DEREK THOMS

1      A.   The police service canine handler will issue a

2   verbal warning giving the subject an opportunity to

3   submit prior to deploying the police service canine,

4   unless an announcement would be tactically

5   inappropriate or exigent circumstances exist.

6      Q.   Okay.  Is this consistent with what you

7   recalled the use of force policy be on the day in

8   question?

9      A.   Yes.

10      Q.   Okay.  All right.  Give me a minute.  Let me

11   think of some more stuff.

12           Take a break.

13           (Recess taken from 5:50 p.m. to 5:54

14           p.m.)

15           MR. LACY:  Q.  Okay.  Are we ready?

16      A.   Ready.

17      Q.   Back on the record.

18           Deputy Thoms, have you done your best to

19   testify truthfully here today?

20      A.   I have.

21      Q.   And given your testimony in regards to this

22   conversation with Sergeant whoever from Oakland Police

23   Department --

24           MR. MURPHY:  Was this the sergeant on the

25   scene just before the search?

194